UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

Francis Rose LACAVA,

                    **Plaintiff,**

        -against-

Michael J. ASTRUE,
Commissioner of Social Security,

                    **Defendant.**

------------------------------------------------------------X

```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/27/12
```

11-CV-7727 (WHP)(SN)

**REPORT AND RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge,**

**TO THE HONORABLE WILLIAM H. PAULEY III:**

      Plaintiff Rose Lacava brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits. The Commissioner has moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket No. 16.) Plaintiff cross-moved for judgment on the pleadings and, in the alternative, requested remand to the Commissioner for further proceedings. (Docket No. 19.) For the reasons set forth below, I respectfully recommend that the Commissioner's motion be DENIED, the plaintiff's motion be GRANTED in part and DENIED in part, and the case be remanded to the Commissioner for further development of the record.

      At issue in this case is the duty of the Administrative Law Judge ("ALJ") to develop the administrative record. This duty requires resolution of factual inconsistencies in the record that are critical to the plaintiff's claim and consideration of retrospective diagnoses that are not contradicted in the record. The Court concludes that the ALJ did not meet his affirmative duty to

develop the record in this case in two respects. First, he failed to recognize or resolve a factual inconsistency in the record that was dispositive to his ruling. Second, he failed to recognize the legal relevance of medical records referring to a period of time after that of the alleged disability. As a result, the ALJ overlooked the need to obtain retrospective opinions and diagnoses of treating physicians. In the absence of a complete record, this Court is unable to determine whether the ALJ's decision regarding Lacava's disability was supported by substantial evidence, and the case should be remanded to the Commissioner for further development.

## FACTUAL BACKGROUND

Plaintiff Rose Lacava has suffered from schizoaffective disorder, major depressive syndrome, and asthma for several decades. She applied to the Social Security Administration ("SSA") for disability benefits on April 8, 2009, (R. 97-100), alleging disability from July 15, 1983 through December 31, 2007, the date she last met her disability insured status under the Social Security Act (the "Act"). When the SSA denied initial review on September 14, 2009, (R. 54-57), Lacava requested a hearing before an ALJ (R. 58). With appointed counsel, (R. 95), she amended the onset date to October 10, 2007, the date of the earliest medical evidence in the record at the time. ALJ Dennis Katz reviewed the application de novo on March 2, 2011. (R. 28-49.) On March 25, 2011, the ALJ decided that Lacava was not disabled within the meaning of the Act during the period under review. (R. 13-22.) The Appeals Council denied Lacava's request for further review on August 24, 2011, making the ALJ decision final and reviewable by this Court under 42 U.S.C. § 405(g) and § 1383(c)(3).

Lacava filed a timely complaint in the United States District Court for the Southern District of New York on October 26, 2011. (Docket No. 2.) The case was referred to Magistrate

2

Judge Debra Freeman on November 11, 2011 for a report and recommendation and re-assigned to my docket on September 24, 2012.  (Docket Nos. 6, 24.)

## I.     Medical History

Plaintiff Lacava was born on September 17, 1955 and was 52 years old during the period at issue.  (R. 50.)  The record indicates a history of mental health problems, most consistently schizoaffective and major depressive disorders.  (R. 256, 305, 320.)  There is no date of onset in the record, but Lacava reports being in mental health treatment in the 1980s, and she began association with the Hudson River Psychiatric Center ("HRPC") in 1990.  (R. 305.)  During the 1980s and 90s, she was hospitalized several times for suicidal ideations and one drug overdose.  (R. 116-17, 305, 421.)  She was admitted to HRPC in 2004 with a diagnosis of major depressive disorder with psychosis, (R. 310, 415), and enrolled in the outpatient program sometime in late 2008 (R. 309-10).

Lacava has been prescribed and has taken numerous medications over the years: Seroquel and Zyprexia, frequently prescribed for schizophrenia; Trazadone, Triliptal, and Wellbutrin, which are antidepressants; Ritalin, prescribed for attention deficit problems; Albuterol and Adavair, prescribed for asthma; and Effexor, for night sweats.  (R. 148, 305, 310, 312, 415.)  During the period at issue, she was prescribed Seroquel and Trazadone.  (R. 305.)

### A.     Evidence During the Period of Alleged Disability

There are two medical records available, both from the HRPC, that reflect Lacava's condition during the disputed period, October, 2007 through December, 2007.  The first, dated October 10, 2007, notes the existing diagnosis of schizoaffective disorder and major depressive disorder, (R. 305), though it is unclear whether that diagnosis is a result of a contemporaneous evaluation or based on Lacava's testimony to the staff.  The record shows that Lacava reported

insomnia, hearing voices, and low motivation, appetite, and energy.  The HRPC staff member indicated that Lacava complained of poor short-term memory and concentration and noted that she displayed "isolating" behavior and "tangential and racing" thought processes.  (Id.)  The staff member described her as "appropriately dressed," "well groomed," and "cooperative."  (Id.)

Lacava's second examination during the period at issue was on October 22, 2007.[1]  She met with a psychiatrist, Dr. Alarkson, who noted that she reported having "a hard time dressing, showering, using the phone or bus."  (R. 310.)  He noted her complaints of "tearfulness," and poor sleep and concentration, yet observed that she seemed "less anxious, less withdrawn, and cooperative."  (Id.)  He further observed: "thoughts are organized without a sign of delusions or looseness of association."  (Id.)  He noted that she reported hearing voices that are "non-violent."  He described her as having "average intelligence," "no cognitive deficits," and commented that she "lacks insight" and her "judgment is fair."  (Id.)  The version of the October 22, 2007 record that was provided to the Court after the ALJ decision shows that Dr. Alarkson prescribed 100 mg of Seroquel, individual counseling "to improve coping with psychological stress," and group treatment for "anxiety and anger management."  (R. 416.)  His risk assessment was "not at high risk," noting that she showed no acute or intermediate course of decompensation.  (Id.)  He indicated a Global Assessment of Functioning score of 55.[2]  (R. 312, 416.)

---

[1] The date of this visit was apparently misunderstood by the ALJ.  The medical form was updated on October 16, 2008, causing the reference date to change.  But documents provided to the Court subsequently replicate certain entries, clarifying that the majority of the notes taken on pages R. 310-12 are from on or about October 22, 2007.  (R. 412-31.)

[2] "[Global Assessment of Functioning] rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning."  Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 34 (4th ed. rev. 2000)).  See also Briscoe v. Astrue, 11 Civ. 3509 (GWG), 2012 WL 4356732, at *2 (S.D.N.Y. Sept. 25, 2012).  A GAF score from 60-51 represents "Moderate symptoms (e.g., flat and circumstantial speech,

4

**B.      Evidence After the Period of Alleged Disability**

On October 16, 2008, Dr. Alarkson described her as having a "characterological pattern of histrionic, borderline and antisocial traits." (R. 312.) He prescribed Wellbutrin, Seroquel, and individual and group therapy. (Id.) Lacava continued to go to HRPC until November 3, 2008. (R. 409.)

On April 13, 2009, Lacava began treatment at Putnam Family and Community Services ("PFCS"). According to the screening notes, Lacava had been arrested three times in the previous year. (R. 270.) The notes relay that the Putnam County Jail considered her "quite psychotic" and deemed her a suitable candidate for the Mental Health Court; that court had sent her to PFCS for treatment. (Id.)

The initial screening notes from PFCS, dated April 13, 2009, describe Lacava's mental health history and childhood, (R. 270-72), and describe her strengths as "engaging, intelligent, motivated to get her life back on track" (R. 273). The notes further state: "[i]t appears Rose has been mentally ill for many years, but received erratic treatment due to financial issues (too much money to qualify for benefits, too little to pay out of pocket). Rose could benefit from consistent attendance at [Continuing Day Treatment] . . . ." (R. 274.) At the second visit on April 15, 2009, the staff member described her as "a bit overwhelmed . . . but is open about her overwhelm [*sic*], and is doing her best to manage. Rose is friendly when approached, but as of now, is keeping to herself and not initiating much contact with other clients. She is quiet as well in groups but attentive to the process." (Id.)

occasional panic attacks) OR moderate difficulty in social occupational, or social functioning (e.g., few friends, conflicts with co-workers)." See http://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf (last visited November 20, 2012).

According to a PFCS treatment report on June 5, 2009, Lacava received treatment "5 days weekly." (R. 254.) Her treating physician, Dr. Robert Roy, Medical Director at PFCS, reported on June 5, 2009 that her current symptoms were "Mood Lability – depressed and irritable," "anxiety," "low tolerance for stress," "poor impulse control," and "difficulty maintaining concentration." (Id.) At that time, Lacava was prescribed Wellbutrin, Seroquel, and Trileptil. (R. 255.) Dr. Roy described the expected duration of Lacava's condition as "ongoing, prognosis fair." (Id.) When prompted to describe Lacava's history, Dr. Roy wrote:

> Rose has a long history of mental health concerns which have largely gone untreated until now. Rose has had auditory hallucinations for many years. On at least two occasions Rose has experienced command hallucinations and followed through on the commands . . . . Until now Rose was unable to obtain treatment for her mental health concerns for financial reasons. At this time, Rose presents as well groomed and neatly dressed. Attitude is cooperative. Thought processes are logical but somewhat circumstantial. Content is appropriate. With medication no hallucinations have been reported and no delusions elicited. Mood appears to fluctuate between depressed and irritable, somewhat anxious at times.

(R. 256.) Dr. Roy opined that Lacava "is able to perform [activities of daily living] with assistance." (R. 258.) When prompted to comment on her ability to function in a work-like setting, Dr. Roy noted that Lacava was currently working in the Transitional Employment Program at PFCS for "no more than three hours weekly" and concluded that she is "unable to work outside of a workshop setting for the disabled." (R. 258.) Dr. Roy indicated that Lacava had "no limitation" to her understanding and memory, but that she demonstrated limited concentration and persistence. (R. 259.) He further indicated that she has "difficulty getting along with others, [is] easily irritable, [has] poor impulse control, particularly in regards to oral expression." (Id.) Finally, he indicated that she "responds anxiously to change" and has "low stress tolerance." (Id.)

6

The treatment at PFCS appeared to have had a positive effect on Lacava's life: on December 17, 2009, the staff member who screened the Lacava noted that Lacava "currently feels fine and better than she has ever felt." (R. 314.)

The records from Putnam County Correctional Facility ("PCCF"), (R. 324-27), do not include extensive descriptions of her condition. But in a questionnaire completed on January 7, 2010, as part of the Suicide Prevention Screening at PCCF, the examiner answered "No" to the statements, "Detainee shows signs of depression" and "Detainee appears overly anxious, panicked, afraid, or angry." (R. 326.)

The records from Putnam Hospital Center are mostly physical in nature, representing several visits between July 9, 2009 and September 10, 2010 for rib pain, (R. 343), rectal bleeding, (R. 360), neck pain, (R. 369), an abdominal abscess, (R. 375), and asthma problems (R. 391).

## II.     Non-Medical History

### A.     Abilities and Condition

Lacava completed the twelfth grade, (R. 119, 305), and is fluent in English (R. 112). Since April 2009, she has lived in an apartment program run by Search for Change in Brewster, New York. (R. 37-38.) Lacava lives alone, but she can call counselors who are available 24 hours a day for assistance. Mental health care is required for residents and included in the arrangements. (Id.) Lacava indicates that her mental impairments cause her to lead a simple life. She cooks "easy" things for herself: soup, spaghetti, grilled cheese. (R. 38.) She grocery shops, but always with a counselor or friend. (Id.) She needs this guidance to help her "stay on track." (R. 39.) She reports that she loses concentration easily and that the bright lights, high ceilings, and the people at the store make her anxious. (Id.) In general, she describes high levels of

7

anxiety when she has to catch a bus at a certain time or attend an appointment: "I just obsess over it." (R. 43.)  She likes to read, listen to music, crochet, and garden, (R. 130), but notes that she has an increasingly hard time reading because she gets distracted and has to "read the same thing over and over" (R. 130).  She indicated that she had not watched a movie in a long time because she could not concentrate long enough.  (R. 44, 130.)

Lacava reports a history of auditory hallucinations.  In an undated SSA Disability Report, Lacava reported, "Under stress I hear a mean voice telling me things to do that I shouldn't be doing. In the past, I committed a felony because of this voice. Because of this I wouldn't be able to keep a job because this happens too often." (R. 113.)

At the hearing, the ALJ inquired whether Lacava experienced the symptoms she described during the time period of alleged disability, October 10, 2007 to December 31, 2007. Lacava responded that she began hearing voices in the 1990s and continued to hear them in 2007. (R. 41-42.)  She also said that she isolated herself and avoided other people in 2007. (Id.)

### B.    Work History

Lacava has a varied work history.  The earliest job on record is cleaning houses, which she reports as lasting from 1985 to 2000. (R. 135.)  Since then, Lacava's jobs included working as a teacher's assistant at United Cerebral Palsy ("UCP"), (R. 114, 135, 168), as an assistant manager and cashier at a car wash, (R. 31, 114, 135, 168, 185, 306), and on the production line at a store called Edible Arrangements (R. 31-33, 135-36, 168).

The precise dates of these jobs are inconsistent in the record.  The record states that Lacava worked at UCP from April 1998 to August 1999, (R. 114), and from September 1999 to November 2000 (R. 168).  The record states that Lacava worked at the car wash from May 2006 to January 2007, (R. 135), April 2006 to February 2007, (R. 306), and May 2007 to February

2008 (R. 35, 168). In response to this confusion, on June 22, 2011, Lacava wrote to her attorney at the time, Brian Parker of Legal Services of Hudson Valley, to clarify her employment at the car wash. She wrote, "I need to clarify the dates of my employment at the SPLASH Car Wash. I was hired in the spring of 2006. I worked through the summer, fall, and early winter in 2007." (R. 185.)

Lacava's employment dates at Edible Arrangements are similarly confused in the record. In the SSA Claimant's Work History Background, she reported that she worked there from May 2008 through August 2008, though these entries are accompanied by question marks. (R. 168.) In the SSA Work History Report, Lacava recorded that she worked there from May 2007 to July 2007. (R. 135.) From other evidence in the record, the end date appears to be on or before August 7, 2007, the date Lacava was arrested for possession of stolen property. (R. 306.) After this arrest, Edible Arrangements would not rehire her. (R. 35, 306.)

Lacava asserts that she has progressively cut back her working hours. She now works two-and-a-half hours per week as a receptionist at the Mental Health Association. (R. 33-34.)

C. **Personal Life**

Lacava reports that her mother was physically and emotionally abusive when she was growing up, and that her uncle abused her physically and sexually when she was 12 years old. Lacava has two children through her former husband, one is disabled and lives in a group home. (R. 306.) Her marriage ended in 2001, and Lacava began living with a partner who died in 2005. (Id.)

Lacava has engaged sporadically in violent and criminal behavior. She tried to kill her handicapped daughter twice: Lacava attempted to give her daughter pills when she was a toddler; she attempted to suffocate her daughter when she was 10 years old. (R. 305.) In the 1990s, she

9

reports that she killed her pet bird because a man's voice told her she did not deserve to have a pet. (Id.)  She admits to drug abuse in the past, but has been clean since January 2005. (R. 278.) Lacava was arrested for larceny in May 2002, and for criminal possession of stolen property on August 8, 2007. (R. 305-06.)  She denies the charges in this arrest, claiming that she found a woman's pocketbook and called the woman because her identification was in the wallet.  (R. 305.)  She was in jail for two weeks, and her former husband posted $20,000 for her bail. (Id.) As mentioned above, there is an unspecific reference of Lacava being arrested three times between 2007 and 2008.  (R. 270.)

## PROCEDURAL BACKGROUND

### I.      The Administrative Hearing and the Final Administrative Determination

At the administrative hearing, the ALJ questioned Lacava directly.  He focused on her work history, questioning her about her various jobs and the responsibilities she held at each one, as well as her reason for leaving.  (R. 31-36.)  Lacava's attorney inquired about her living situation at Search for Change Housing and her habits of daily living, focusing on the strategies that Lacava has developed to reduce stress in her life.  (R. 37-40.)  He also asked her to elaborate on the auditory hallucinations she had experienced over the years, as well as the situations that trigger stress and panic.  (R. 41-46.)  The ALJ re-examined Lacava for further clarification on her living situation.  (R. 47-48.)

The ALJ issued a decision on March 25, 2011, in which he concluded that Lavaca was not disabled from October 10, 2007 to December 31, 2007, her date last insured.  (R. 13-22.)

### II.     Appeal of the Agency Determination

Following the final administrative determination, Lacava's counsel submitted a brief to the SSA Appeals Council arguing that the ALJ decision was not supported by substantial

evidence, and that the dates supplied by Lacava for her work activity were incorrect. (R. 178-80.) Counsel also submitted a notarized letter from Lacava providing the dates of her employment at the SPLASH Car Wash, "spring of 2006 . . . through summer, fall, and early winter in 2007," (R. 185), and submitted additional medical records that reflected various medical visits between March 11, 1994 and August 23, 2011 (R. 418-31).

On August 24, 2011, the Appeals Council denied Lacava's request for review of the ALJ's decision, stating that there was no reason under its rules to review the ALJ decision. (R. 1.) On October 26, 2011, Lacava filed a complaint in the United States District Court for the Southern District of New York requesting review of the Commissioner's decision. (Docket No. 2.)

## DISCUSSION

### I.      Standard of Review

A party may move for a judgment on the pleadings "[a]fter the pleadings are closed — but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Dargahi v. Honda Lease Trust, 370 F. App'x 172, 174 (2d Cir. 2010).

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d

Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the

Commissioner as to any fact are supported by substantial evidence, those findings are

conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). "Where there is substantial

evidence to support either position, the determination is one to be made by the factfinder."

Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). This means that if there is sufficient

evidence to support the final decision, a district court must grant judgment in favor of the

Commissioner.

## II.     Definition of Disability

A claimant is disabled under the Social Security Act if the claimant is unable "to engage

in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The

claimant's impairment must be "of such severity that he is not only unable to do his previous

work but cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy." § 423(d)(2)(A). The

disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic

techniques." § 423(d)(3).

Under the authority of the Act, the Social Security Administration has established a five-

step sequential evaluation process when making disability determinations. See 20 C.F.R. §§

404.1520, 416.920. The steps are followed in order; if it is determined that the claimant is not

disabled at a step of the evaluation process, the evaluation will not progress to the next step. The

Court of Appeals for the Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity. Where the claimant is not, the

> Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–184 (2d Cir. 2003) (citation omitted). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the final step. Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998). Thus, in order to support a finding that the claimant is not disabled at the fifth step, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given the claimant's residual functional capacity, age, education and past relevant work experience. 20 C.F.R. §§ 404.1512(f), 404.1560(c), 416.912(f) and 416.960(c).

Title 20 C.F.R. § 404.1520a provides additional information to guide evaluations of mental impairments. Calling it a "complex and highly individualized process," 20 C.F.R. § 404.1520a(c)(1), the section focuses the ALJ's inquiry on determining how the impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404.1520a(c)(2). The main areas that are assessed are activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation; each is rated on a five-point scale. 20 C.F.R. § 404.1520a(c)(3)-(4). If an impairment is given the rating of "severe," then the ALJ is instructed to determine whether the impairment qualifies as a listed mental disorder. 20 C.F.R. § 404.1520a(d).

13

A mental disorder such as schizophrenia will qualify as a "listed impairment" if there is "medically documented persistence, either continuous or intermittent, of . . . delusions . . . hallucinations . . . or . . . emotional withdrawal and/or isolation . . . resulting in at least two of the following: Marked restriction of activities of daily living; Marked difficulties in maintaining social functioning; Marked difficulties in maintaining concentration, persistence, or pace; or Repeated episodes of decompensation, each of extended duration . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.03(A), 12.03(B). If the mental disorder does not qualify as a listed impairment under these standards, it will still qualify as a disability if there is:

> a medically documented history of a chronic schizophrenic, paranoid, or other psychotic disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: [r]epeated episodes of decompensation, each of extended duration; or a [r]esidual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.03(C).

## III.    The ALJ's Determination

To assess Lacava's claim of disability, the ALJ followed the five-step analysis required by 20 C.F.R. § 404.1520. Beginning with step one, the ALJ concluded that Lacava had not engaged in substantial gainful activity during the relevant period. (R. 18.)

At step two, the ALJ concluded that Lacava had severe impairments within the meaning of the SSA arising from her schizoaffective disorder. He noted her additional asthma diagnosis, but determined that this has not caused limitations in the workplace. (R. 18-19.)

14

At step three of the analysis, the ALJ determined that the impairment did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ concluded that Lacava did not have any restrictions in her daily living and social functioning and only moderate restrictions in her concentration, persistence, and pace. He noted that during the evaluation on October 10, 2007, Lacava was appropriately dressed and well-groomed. (R. 19.)

Before continuing to step four of the analysis, the ALJ assessed Lacava's residual functioning capacity ("RFC"), which evaluates the applicant's exertional limitations. The ALJ determined that Lacava had no exertional limitations and remained capable of performing basic, unskilled work. To reach this conclusion, the ALJ considered "objective medical evidence," "other evidence," and "opinion evidence," in accordance with 20 C.F.R. 404.1529 and the Social Security Rulings ("SSR") 96-4p, 96-7p, 96-2p, 96-5p, 96-6p and 06-3p. (Id.) Then the ALJ outlined a two-step process. First, the ALJ considered whether there was an underlying medically determinable mental impairment that could have produced the claimant's pain or symptoms. Second, the ALJ evaluated the intensity, persistence, and limiting effects of the symptoms to determine how they limited the claimant's functioning. (Id.) The ALJ explained that, whenever claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the statements based on the entire case record. (R. 19-20.)

The ALJ acknowledged Lacava's history of schizoaffective disorder, a medically determinable impairment. (R. 20.) To evaluate the limiting effects of the disorder, he examined the treating notes from October 10, 2007, noting her complaints of hearing voices and her

15

anxious mood and affect. He also cited the treating notes that described her thoughts as well-organized and her GAF of 55. (R. 21.)

Noting the paucity of treating notes from the disputed period, the ALJ supplemented the medical evidence with an evaluation of Lacava's credibility. He cited Lacava's testimony that she worked at a car wash for almost a year during the period she claims to have been disabled, February 2007 to February 2008.[3] (Id.) He further noted that she worked at Edible Arrangements after her date last insured, from May 2008 to August 2008, and left due to her arrest and incarceration, that is, "non-medical" reasons.[4] (Id.) From this, the ALJ concluded that "the evidence does not establish that the claimant's schizoaffective disorder precluded her from performing all work activity through her date last insured." (Id.) He further stated that the 2009 documents from Putnam Family and Community Services and the Putnam County Correctional Facility were "not relevant as they do not address the claimant's condition during the period at issue." (R. 21).

In the last part of the analysis of Lacava's RFC, the ALJ highlighted certain inconsistencies in claimant's testimony. He focused on the fact that Lacava told her therapist she terminated her job with the car wash due to asthma (see R. 306), yet reported in her testimony that she left due to noise and stress (see R. 35). The ALJ concluded that Lacava's statements

---

[3] As discussed above, the dates of her employment at the car wash are disputed in the record. Some dates provided refer to a time period before her period of alleged disability, (R. 135), and others refer to a time during or after (R. 168).

[4] These dates are also disputed in the record: the SSA Work History Report says she worked at Edible Arrangements from May 2007 to July 2007, (R. 135), while the SSA Claimant's Work Background Report says she worked there from May 2008 to August 2008, with question marks indicating uncertainty (R. 168).

about her limiting symptoms were "not entirely credible" and described her limitations as "moderate." (R. 21.)

At step four of the analysis, the ALJ assessed whether Lacava's RFC allowed her to perform the requirements of her past relevant work. The ALJ determined that Lacava did not have any past relevant work because none of her past jobs was performed at substantial gainful activity levels. (Id.)

At step five, the ALJ considered whether Lacava could be expected to do any other work in the national economy. The ALJ mentioned Lacava's RFC, age, education, and work experience and referred to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. The ALJ found that Lacava was considered a person approaching advanced age as of the date last insured, according to 20 C.F.R. 404.1563(d), had at least a high school education and was able to communicate in English. (Id.) The ALJ further found that Lacava did not have work skills transferable to the skilled or semiskilled activities of other work. (Id.) Finally, the ALJ concluded that jobs existed in significant numbers in the national economy that Lacava could perform. (Id.) He stated that Lacava's ability to perform work at all exertional levels was compromised only by nonexertional limitations that had "little or no effect" on the occupational base of unskilled work at all exertional levels. Again referencing section 204.00 of the Medical-Vocational Guidelines, the ALJ found Lacava "not disabled" as defined in the Social Security Act. (R. 22).

On appeal to the District Court, neither party challenges the ALJ's analysis at steps one, two, and three. Both parties agree that Lacava did not engage in substantial gainful activity during the relevant period, and that Lacava had severe impairments arising from her schizoaffective disorder. Plaintiff does not explicitly refute the ALJ's decision that her

17

impairment did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Rather, Lacava challenges the validity of the hearing itself. She argues that the ALJ, instead of contacting treating physicians and considering the retrospective diagnosis, substituted his own opinion for those of the treating physicians. (Pl. Br. at 5, 9, 13-19.) Lacava further argues that the ALJ's finding that she had the residual functional capacity for work at all exertional levels was not supported by substantial evidence (step four) and that the Commissioner did not carry his burden to show that plaintiff could perform work in the national economy (step five). (Pl. Br. at 19-20.) Finally, Lacava argues that the ALJ's finding that her subjective complaints were not credible was not supported by substantial evidence. (Pl. Br. at 19-23.)

## IV.    Legal Errors

Plaintiff's contention that the administrative hearing was invalid because the ALJ did not adequately develop the record must be addressed as a threshold issue. Indeed, the Court cannot rule on whether the ALJ's decision regarding Lacava's functional capacity was supported by substantial evidence if the determination was based on an incomplete record.

The central issue before this Court, therefore, is the extent of the ALJ's duty to develop the record before making a determination of disability. The Court finds that the ALJ did not fulfill his duty to develop the record. First, he did not resolve a critical factual inconsistency. Second, he disregarded the importance of obtaining a retrospective diagnosis under these circumstances. These errors render the record incomplete and the Court unable to evaluate the final agency determination.

18

A.      **Applicable Law**

1.  **The Duty to Develop the Record**

When the ALJ assesses a claimant's alleged disability, the ALJ must develop the

claimant's medical history for at least a twelve-month period.  42 U.S.C. § 423(d)(5)(b), 20

C.F.R. § 404.1512(d).  Further, the Act authorizes the Commissioner to "issue subpoenas

requiring the attendance and testimony of witnesses and the production of any evidence that

relates to any matter under investigation."  42 U.S.C. § 405(d).

The Court of Appeals for the Second Circuit considers this statutory authorization to

impose an affirmative duty on the ALJ to develop the record.  Indeed, before a district court can

evaluate the ALJ's conclusions, the court must ensure that the claimant received a full hearing.

Echevarria v. Sec'y of Health & Human Servs., 685 F.2d 751, 755 (2d Cir. 1982) (holding that an

ALJ must ensure that the claimant had a "full hearing under the Secretary's regulations and in

accordance with the beneficent purposes of the Act" (citing Gold v. Secretary of HEW,

463 F.2d 38, 43 (2d Cir. 1972))).  Due to the "non-adversarial nature" of social security

proceedings, a full hearing requires the ALJ to "affirmatively develop the record."  Echevarria,

685 F.2d 751 at 755.  Whether or not the claimant is represented by counsel, Tejada v. Apfel,

167 F.3d 770, 774 (2d Cir. 1999), the ALJ must contact medical sources and gather any

additional information if the ALJ believes that the record is inadequate to make a determination.

When the ALJ has failed to develop the record adequately, the district court must remand to the

Commissioner for further development.  See, e.g., Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

The ALJ's duty to develop the record is enhanced when the disability in question is a

psychiatric impairment.  The Regulations articulate that claims concerning mental disorders

19

require a robust examination that is sensitive to the dynamism of mental illnesses and the coping

mechanisms that claimants develop to manage them:

> Particular problems are often involved in evaluating mental impairments
> in individuals who have long histories of repeated hospitalizations or
> prolonged outpatient care with supportive therapy and medication. For
> instance, if you have chronic organic, psychotic, and affective disorders,
> you may commonly have your life structured in such a way as to minimize
> your stress and reduce your symptoms and signs. In such a case, you may
> be much more impaired for work than your symptoms and signs would
> indicate. The results of a single examination may not adequately describe
> your sustained ability to function. It is, therefore, vital that we review all
> pertinent information relative to your condition, especially at times of
> increased stress.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E). Similarly, Social Security Ruling 85-15 directs

the Commissioner to consider that "determining whether these individuals will be able to adapt

to the demands or 'stress' of the workplace is often extremely difficult." The Ruling explains

that this difficulty arises because individuals with mental illnesses "adopt a highly restricted

and/or inflexible lifestyle within which they appear to function well." SSR 85-15. The Rulings

point out that, when claimants are in structured settings, they are able to function adequately "by

lowering psychological pressures, by medication, and by support from services." (Id.)

The enhanced obligation to obtain a broad view of the claimant's history and abilities is

especially relevant once the ALJ has recognized an impairment and subsequently must determine

the date of its onset. Caputo v. Astrue, 07 Civ. 3992 (DLI)(JO), 2010 WL 3924676, at *3

(E.D.N.Y. Sept. 29, 2010). Social Security Ruling 83-20 states, "because mentally ill persons

may not be capable of protecting themselves from possible loss of benefits by furnishing

necessary evidence concerning onset, development should be undertaken in such cases to

ascertain the onset date of the incapacitating impairment. Contact with the individual's family,

former employers, and other associates may lead to information about previous hospitalizations,

medical treatment, or manifestations of symptoms prior to the current hospitalization." SSR 83–20. Therefore, in cases where the inquiry includes determination of the date of disability and the ALJ is faced with sparse information, the ALJ's duty to develop the record extends to collecting affidavits and testimony from individuals close to the claimant.

### 2. The Treating Physician Rule

The ALJ's development of the record centers around the opinions and diagnoses of the claimant's treating physician. The "treating physician rule" instructs the ALJ to give controlling weight to the opinions of a claimant's treating physician, as long as the opinion is well-supported by medical findings and is not inconsistent with the other evidence in the record. 20 C.F.R. § 404.1527(c)(2). While the decision on the ultimate issue of disability is one reserved for the Commissioner, 20 C.F.R. § 404.1527(d)(2); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."), the ALJ may not discredit the opinion without "affirmatively seek[ing] out clarifying information from the doctor." Duncan v. Astrue, 09 Civ. 4462 (KAM), 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011). Indeed, the ALJ cannot discount a treating physician's opinion unless the ALJ believes that it "lack[s] support or [is] internally inconsistent." Id.

If the ALJ decides to discredit the opinion of a treating physician, the ALJ must follow a structured evaluative procedure. This procedure evaluates the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) how consistent the treating physician's opinion is with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors. 20 C.F.R. § 404.1527(c)(2)-(6). This process must be transparent: the regulations state that the

21

Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Indeed, where an ALJ does not credit the findings of a treating physician, the claimant is entitled to an explanation of that decision. Snell, 177 F.3d at 134.

Thus, the "treating physician rule" is inextricably linked to the duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination. In this Circuit, the rule is robust. See, e.g., Schaal, 134 F.3d at 503-05 (remanding a case to the SSA for further development "because we are unsure exactly what legal standard the ALJ applied in weighing [the treating physician's] opinion, because application of the correct standard does not lead inexorably to a single conclusion, and because the Commissioner failed to provide plaintiff with 'good reasons' for the lack of weight attributed to her treating physician's opinion as required by SSA regulations").

### 3.  Retrospective Diagnosis

The "treating physician rule" applies to physicians providing retrospective diagnoses. Retrospective diagnoses and opinions are those from a treating physician that relate to a time period in the past, including periods when the physician was not the treating source. Although retrospective diagnoses do not command the same deference as contemporaneous diagnoses, they are afforded substantial weight unless contradicted by other medical evidence or by "overwhelmingly compelling" non-medical evidence. Byam v. Barnhart, 336 F.3d 172, 183 (2d Cir. 2003); Rivera v. Sullivan, 923 F.2d 964, 968-69 (2d Cir. 1991). Indeed, "the fact that a treating physician did not have that status at the time referenced in a retrospective opinion does

22

not mean that the opinion should not be given some, or even significant weight." Monette v.

Astrue, 269 Fed. App'x 109, 113 (2d Cir. 2008).

Where there is ambiguity regarding whether a treating physician's statement bears on the

alleged period of disability, the ALJ must seek to resolve this ambiguity through testimony.

Rogers v. Astrue, 05 Civ. 7506 (KMK)(LMS), 2012 WL 4473266, at *9 (S.D.N.Y. Sept. 28,

2012) ("[I]t was legal error for the ALJ to rely on Plaintiff's lack of evidence from the relevant

time period to deny benefits without first attempting to adequately develop the record, or to

pursue the possibility of retrospective diagnosis.") (citations omitted); Wiebicke v. Astrue, 10

Civ. 3371 (BSJ)(FM), 2012 WL 2861681, at *17 (S.D.N.Y. July 2, 2012) ("To discharge his

duty to develop the record, the ALJ should have sought clarification from [the treating physician]

as to whether his [later] impressions applied to the [earlier] period at issue.").

Consideration of the duty to develop the record, together with the inclusion of

retrospective diagnoses in the scope of the treating physician rule, produces an obligation that

encompasses the duty to obtain information from physicians who can provide retrospective

opinions about the claimant. The need for such rigorous development of the record is especially

acute when claimants with mental disorders do not have an extensive medical record from the

period of alleged disability. See SSR 85-15. Indeed, the ALJ possesses the statutory authority to

request that physicians provide clarification regarding the claimant's condition during the

relevant period. 42 U.S.C. § 405(d).

## B.    Assessment of the ALJ's Development of Lacava's Record

Lacava argues that the ALJ "failed in his obligations to fully and fairly develop the

record [and] to fairly consider the evidence in its entirety." (Pl. Br. 5.) Lacava points to her

reports of mental impairments between 2007 and 2009, arguing that the ALJ disregarded this

23

evidence and instead drew his own inferences in conflict with the treating physicians' statements. Lacava argues that, since the ALJ "obviously had doubts concerning the nature and severity . . . of the limitations . . . he had [an] obligation to attempt and explain resolution of such doubts [*sic*]." (Pl. Br. 9.) Lacava maintains that, in order to address concerns regarding the nature and severity of the claimant's medical impairments, the ALJ should have sought the assistance of a medical expert and the advice of a consultative examiner, as well as obtained an RFC assessment at the SSA's expense. (Pl. Br. 7.)

Although the Court agrees with Lacava that the ALJ did not meet his affirmative duty to develop the record, Lacava mischaracterizes the factors that trigger this duty. In fact, the ALJ obtained all relevant treatment records available from the statutorily-required time period. The ALJ made no indication in his opinion that he considered the medical data insufficient, or that he considered any part of the record ambiguous.

Instead, the ALJ considered the treating notes from October 10, 2007, and made an evaluation, as is his role. The ALJ focused on the fact that, according to Dr. Alarkson, Lacava presented well and appeared to be in charge of her thoughts and behaviors. (R. 305.) While the ALJ acknowledged the existing diagnosis of schizoaffective disorder and major depressive disorder, as well as Lacava's complaints of hearing voices, insomnia, and isolating behavior, he was doubtful of the disabling effects of the symptoms. Instead, the ALJ was swayed by the testimony that Lacava had worked at the car wash from February 2007 to February 2008, the time period during which she claims to have been disabled. As a result, the ALJ concluded that "the evidence does not establish that the claimant's schizoaffective disorder precluded her from performing all work activity through her date last insured." (R.20.) Barring other deficiencies, the ALJ is entitled to make an evaluation of the evidence in the record and assess the claimant's

24

RFC. Indeed, even in the face of contradictory evidence, the ALJ is the ultimate factfinder. See, e.g., Alston, 904 F.2d at 126.

Nevertheless, the ALJ made two errors in his analysis that render the record inadequate. First, the ALJ failed to recognize the factual inconsistency regarding Lacava's work history. Lacava offered several conflicting dates for her work at the SPLASH Car Wash. In the SSA Claimant's Work Background, she indicated that she worked from May 2007 to February 2008, and included question marks to indicate uncertainty. (R. 168.) At the hearing, the ALJ asked her if she worked from May 2007 to February 2008 and Lacava answered "Right." (R. 34.) But in the SSA Work History Report, Lacava indicated that she worked at SPLASH Car Wash from May 2006 to January 2007 (R. 135); in the SSA Disability Report, she indicated that she worked there from 2006 to 2007 (R. 114). Lacava and her previous attorney attempted to clarify this confusion before the Appeals Council decision by supplying a letter in which Lacava wrote that she was employed by the car wash from "spring 2006" through "summer, fall, winter in 2007."[5] (R. 185.)

The ALJ failed to recognize or consider the additional evidence in the record that cast doubt on the dates of Lacava's tenure at the car wash. Moreover, he relied on the notion that she worked at the car wash from 2007 to 2008, the period of her alleged disability, to determine Lacava's residual functional capacity. Citing the testimony and records indicating that she worked full-time through a date after her alleged onset date, the ALJ determined that "the evidence does not establish that the claimant's schizoaffective disorder precluded her from performing all work activity through her date last insured." (R. 20.) Subsequently, when

---

[5] Even the government appears to have interpreted the evidence as favoring a work history at the car wash from "spring 2006 through winter 2007." (Def. Reply Br. at 8.)

evaluating her credibility, the ALJ noted that the October 10, 2007 treatment records include Lacava's reference to losing her job at a car wash. Instead of using this as an indication that the dates were in doubt, he attributed her later testimony about her 2007-08 dates to a lack of credibility. (Id.)

Factual errors require remand to the ALJ when there is insufficient information in the record to support the ALJ's position without the disputed fact. See, e.g., Cruz v. Barnhart, 04 Civ. 9011 (GWG), 2006 WL 1228581, n.6 (S.D.N.Y. May 8, 2006). When selective reading of the record leaves the facts of a case ambiguous, the record is rendered inadequate and the reviewing court is unable to say with confidence whether the ALJ decision is supported by substantial evidence. Pratts, 94 F.3d at 38 (holding that a factual error involving a missing portion of a transcript required remand because the ALJ's conclusions were not corroborated by the full record); Valerio v. Comm'r of Soc. Sec., 08 Civ. 4253 (CPS), 2009 WL 2424211, at *15 (E.D.N.Y. Aug. 6, 2009) (finding that the ALJ's credibility assessment was not supported by substantial evidence when it was based on the factually erroneous notion that the plaintiff chose not to wear a back brace when the evidence showed that he did). Courts have been particularly inclined to remand when the excluded evidence is significantly more favorable to the claimant than the included facts. Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010); Snell, 177 F.3d at 134. Remand due to factual mistakes is unnecessary only where the excluded evidence is duplicative of the evidence considered or correct application of legal principles could lead to only one conclusion. Zabala, 595 F.3d at 409.

In this case, the ALJ considered one version of Lacava's work history: that she worked at the SPLASH Car Wash from February 2007 to February 2008. This version turned out to be dispositive in his ruling. (R. 21.) He disregarded, or failed to notice, the evidence that Lacava

may have worked there from May 2006 to February 2007, before the period of her alleged disability. This inconsistency leaves the facts of the case ambiguous in a way that holds legal significance. Given the nature of Lacava's claim and the timing of her alleged disability, inclusion of the 2006-07 dates would be significantly more favorable than the other dates. In the face of evidence pointing in two directions – a diagnosis of mental illness and reports of her apparent competency – the ALJ used the dates of her employment as the deciding factor. Because the Court cannot know how the ALJ's decision would have changed with different work dates, it is unable to say with confidence whether the ALJ's decision was supported by substantial evidence.

The second error in the ALJ's reasoning is that he failed to recognize that the treatment records from 2009 trigger the retrospective diagnosis component of the treating physician rule. Far from being "not relevant," (R. 21), the records contain evaluations of Lacava's condition from treating physicians that refer to the relevant time period.

The treating records from 2008 and 2009 portray a person in poor condition. In October 2008, Dr. Alarkson noted a "characterological pattern of histrionic, borderline, and antisocial traits." (R. 312.) The Putnam Family and Community Services reported that Putnam County Jail described her as "quite psychotic" in 2009. (R. 270.) The PFCS staff consistently describes her as having a long-lasting untreated mental illness. (R. 256, 270.) The records also include several statements about Lacava's ability to work. Dr. Roy concluded that Lacava was "unable to work outside of a workshop setting for the disabled," that is, the three hours weekly that Lacava worked in a supervised capacity at the Mental Health Association. (R. 258.)

Although the ALJ is not required to accept any single opinion as dispositive of the disability determination, he must provide reasons for not crediting a treating physician's opinion.

20 C.F.R. § 404.1527(c); Wiebicke, 2012 WL 2861681, at *11.  Here, the ALJ disregarded Dr. Alarkson's 2008 statements and explicitly disregarded Dr. Roy's reports as "not relevant" because they concerned a period after Lacava's alleged disability.  (R. 21.)  Given the retrospective diagnoses prong of the treating physician rule, this rationale is wrong.  For the following reasons, this Court finds that this evidence required further development of the record in order to clarify its retrospective nature.

First, as Lacava's treating physician through the alleged period of disability, the opinion of Dr. Alarkson from 2008 is entitled to significant weight.  See, e.g., Stieberger v. Apfel, 95 Civ. 5622 (LBS), 1998 WL 556156, at *10 (S.D.N.Y. Aug. 31, 1998) ("[A] retrospective opinion based on a current course of treatment . . . should not have been dismissed merely because it was retrospective."); Wagner v. Sec'ty of Health and Human Servs., 906 F.2d 856 (2d. Cir. 1990) (reversing an ALJ's denial of disability benefits where a treating physician diagnosed his patient's condition four years after her alleged onset date and his opinion was not contradicted by other evidence in the record).

This applies to Dr. Roy as well, even though he did not treat Lacava until 2009. Dousewicz v. Harris, 646 F.2d 771, 774 (2d Cir. 1981) (reversing the ALJ's denial of benefits where a present physician reflected on the claimant's condition before he was his patient and testified that the claimant had probably been disabled six years earlier).  Even when a disability is progressive or degenerative, as Lacava's schizoaffective disorder may have been between 2007 and 2009, the retrospective opinion of physicians bears on an evaluation of disability. Rivera, 923 F.2d at 968 ("The mere fact that . . . a claimant's condition is degenerative does not render invalid a physician's retrospective opinion.").

Second, although neither Dr. Alarkson nor Dr. Roy specifically referred to Lacava's condition in 2007, their assessments may bear on the relevant period.  Dr. Roy's records repeatedly refer to a long-lasting untreated mental illness.  It is impossible to know whether he based this opinion on his knowledge about the progression of schizoaffective disorder, or through Lacava's own reports.

In the face of such ambiguity, the ALJ should have sought clarification from the treating physicians by requesting a retrospective testimony.  Wiebicke, 2012 WL 2861681, at *17 ("To discharge his duty to develop the record, the ALJ should have sought clarification from [the treating physician] as to whether his [later] impressions applied to the period at issue.").  Indeed, the ALJ is authorized to do so under 42 U.S.C. § 405(d).  The physicians, as experts, understand the development of mental illnesses and can describe the development of mental illness and the dynamic nature of schizoaffective disorder and depression more generally.  Most relevant for the purposes of Lacava's claim, they could speculate about whether the sparseness of the medical records from the relevant period is due to a stable condition and lack of disability, or whether it was due to, as one staff member expressed in 2009, lack of money and support.  (R.274.) Finally, the opinions are not contradicted by the October 10, 2007 records, which include Lacava's reports of among other symptoms, auditory hallucinations, poor concentration, and anxiety.  (R. 305-09.)  The ALJ's failure to consider the value of the retrospective opinions and diagnoses requires remand in this case.  Brown v. Apfel, 97 Civ. 4404(JG), 1998 WL 767140, at *4-5, n.5 (E.D.N.Y. July 22, 1998) (holding that failure to request retrospective diagnosis from treating physician required a remand when the evidence from the period of alleged disability is sparse).

Remand will correct the two errors in the ALJ's reasoning: the disregard for a critical factual inconsistency and the failure to develop the record to include retrospective diagnoses. In addition, remand will enable a comprehensive examination of Lacava's condition, consistent with the instructions of the Social Security Regulations. While it is impossible and unnecessary for this Court to predict whether the correction of these errors will result in a favorable outcome for Lacava, it is worth noting the similarity between the statements from the Social Security Administration regarding the behavior of individuals with mental illnesses and Lacava's decisions over the past several years. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E); SSR 85-15. She has transitioned to a group home with regular therapy and the availability of 24-hour assistance; that is, she has worked to eliminate sources of stress in her life.

The ALJ's reliance on the work history dates and the disregard of the 2008-09 medical reports allowed a swift determination that ignored the nuances of mental health disability determinations. On remand, the ALJ should consider these factors alongside the physical appearance of competency and organization.

## V.     Use of a Vocational Expert on Remand

Plaintiff argues that the ALJ's opinion cannot be affirmed because the ALJ was required to produce the testimony of a vocational expert to reflect on Lacava's ability to perform unskilled work. While the Court recognizes the ALJ's obligation to call a vocational expert in certain circumstances, the plaintiff is not exactly right in her analysis of this case.

The burden at step five of the evaluation of disability rests with the Commissioner, who must show that the claimant has the residual functional capacity to perform substantial gainful activity in the national economy. Schaal, 134 F.3d at 501. The Medical-Vocational Guidelines guide this evaluation, placing claimants with exertional impairments into grid categories

30

according to their RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f).  Where a claimant is placed in the grid affects the evaluation of whether or not the claimant can engage in gainful work in the national economy.

When a claimant's impairment is not purely physical (that is, it is "nonexertional"), the responsibility of the ALJ is enhanced because the Medical-Vocational Guidelines are not "fully applicable." Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e). If nonexertional impairments diminish a claimant's abilities to perform work, the "decisionmaker must not assume that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work." SSR 85–15. Rather, to evaluate the effect of significant nonexertional impairments on a claimant's ability to perform work, the ALJ should seek out the testimony of a vocational expert or other relevant evidence. Rosa, 168 F.3d at 78, 82 ("[S]ole reliance on the [g]rid [s] may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments . . . . Instead, the Commissioner must introduce the testimony of a vocational expert . . . that jobs exist in the economy which claimant can obtain and perform.") (internal quotations omitted) (citing Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir.1986)).  Under the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden. Acevedo v. Astrue, 11 Civ. 8853 (JMF)(JLC), 2012 WL 4377323 (S.D.N.Y. Sept. 4, 2012); Giannasca v. Astrue, 07 Civ. 341 (VB), 2011 WL 4445141 (S.D.N.Y. Sept. 26, 2011).

In this case, the ALJ did not consult a vocational expert to reflect on Lacava's ability to perform unskilled work presumably because he had already concluded that Lacava's mental limitations had "little or no effect on the occupational base of unskilled work." (R. 22.) See

31

Cotto v. Astrue, 10 Civ. 9005 (KBF), 2012 WL 2512054, at *7 (S.D.N.Y. June 28, 2012) (holding that the ALJ did not err by failing to take the testimony of a vocational expert when the nonexertional impairments of the plaintiff were not so significant that reliance on the grids was inappropriate). The ALJ's conclusion was based on the fact that Lacava purportedly worked during her period of alleged disability and on the exclusion of retrospective diagnoses.

After clarification and development of the record, however, the testimony of a vocational expert may be necessary. Should Lacava's mental impairments appear more severe than originally evidenced, reliance on the Medical-Vocational Guidelines, as the ALJ did in the hearing, may be inappropriate, and the ALJ may not meet the Commissioner's burden at step five. Rosa, 168 F.3d at 82.

## CONCLUSION

For the foregoing reasons, the Court recommends that the Commissioner's motion for judgment on the pleadings be DENIED, and plaintiff's cross motion for judgment on the pleadings be DENIED in part and GRANTED in part. The Court recommends REMAND for further development of the administrative record.

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)).  A party may respond to another party's objections within fourteen days after being served with a copy.  Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable William H. Pauley III at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Pauley.  The failure to file these timely objections will result in a waiver of those objections for the purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).


**SO ORDERED.**

**SARAH NETBURN**
United States Magistrate Judge


DATED:      New York, New York
            November 27, 2012